UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JUNIOUS B.,[1]

                             Plaintiff

-vs-

COMMISSIONER OF SOCIAL
SECURITY,

                            Defendant.

_____

DECISION and ORDER

1:23-CV-6218-CJS

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits.   Plaintiff maintains that such determination is affected by errors of law and not supported by substantial evidence, since the ALJ failed to properly evaluate the impact of his migraine headaches on his ability to work on a regular and continuing basis.   Now before the Court is Plaintiff's motion (ECF No. 8) for judgment on the pleadings and Defendant's cross-motion (ECF No. 9) for the same relief.   For reasons discussed below, Plaintiff's application is denied, Defendant's application is granted, and the matter is dismissed.

## STANDARDS OF LAW

_____

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."   Plaintiff uses two different surnames. *See*, ECF No. 11.

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment[2] which significantly limits his physical or mental ability to do basic work activities.[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[4] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[5]

---

[2] "At step two, the ALJ must determine whether the claimant has a 'severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement.' *Id*. If not, the claimant is deemed not disabled, and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014); *see also*, 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

[3] The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."   20 C.F.R. § 404.1522 (West 2023).

[4] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[5] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert [("VE")]. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d

---

claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error

of law has been made that might have affected the disposition of the case, this court

cannot fulfill its statutory and constitutional duty to review the decision of the

administrative agency by simply deferring to the factual findings of the [administrative law

judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.")

(citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines

the record to determine if the Commissioner's conclusions are supported by substantial

evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more

than a mere scintilla.   It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—
> even more so than the 'clearly erroneous' standard, and the
> Commissioner's findings of fact must be upheld unless a reasonable
> factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin.,
> Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in
> original). "An ALJ is not required to discuss every piece of evidence
> submitted, and the failure to cite specific evidence does not indicate that
> such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019)

(internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec*., No. 22-277-

CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence

standard requires we find more than a mere scintilla of support for the Commissioner's

decision, it is still a very deferential standard of review requiring us to uphold the

Commissioner's findings unless a reasonable factfinder would *have to conclude*

*otherwise*.") (emphasis in original; citations and internal quotation marks omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022) ("We may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'— that is, if no reasonable factfinder could have reached the same conclusion as the ALJ.").

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).   "In other words, this Court must afford the Commissioner's determination considerable deference, and 'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'" *Melia v. Colvin*, No. 1:14-CV-00226 MAD, 2015 WL 4041742, at *2 (N.D.N.Y. July 1, 2015) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

Also, when considering whether a particular finding or decision is supported by substantial evidence, a court may not rely on any *post hoc* rationalizations offered by the

Commissioner, but it may consider evidence that was evidently considered by the ALJ even if it was not expressly mentioned in the administrative decision. *See, Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability. *E.g., Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982). In *Berry*, we noted that, although we would remand for further findings or a clearer explanation where we could not fathom the ALJ's rationale "in relation to evidence in the record," we would not remand where "we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Id*. *See also Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony ...")."); *see also*, *Loni S. v. Comm'r of Soc. Sec.*, No. 3:22-CV-805 (CFH), 2023 WL 4195887, at *19 (N.D.N.Y. June 27, 2023) ("The Court is required to look at the entire ALJ's decision when reviewing for substantial evidence. *See John L. M. v. Kijakazi*, No. 5:21-CV-368 (BKS/TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (citations omitted) ('[W]hile a reviewing court may not affirm the Commissioner's decision based on an impermissible *post-hoc* rationalization, it may affirm where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole.')").

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action, as set forth in the parties' papers.   The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

Plaintiff applied for SSDI benefits claiming to be disabled as of January 29, 2019, due to a combination of mental and physical impairments.

In his SSDI application paperwork Plaintiff listed his disabling conditions as "migraines, conjunctivitis, lumbar sprain, tinnitus, left wrist tendonitis, and lower ankle injury." Tr. 431.   However, since Plaintiff's instant motion concerns the ALJ's evaluation of his headache symptoms, the Court will focus on the medical evidence concerning that condition.

On March 28, 2018, Harbinder Toor, M.D. performed a consultative internal medicine examination in connection with a prior disability application. (Tr. 1233-1237). Plaintiff complained of various physical ailments including pain in his back and knee, but did not mention headaches. *Id*.

On March 13, 2019, Plaintiff was seen by Tyler Batey, M.D. ("Batey"), requesting a disability letter for "school/work." Tr. 1084. Plaintiff complained of "low back pain," but the office note contains no reference to headaches. Tr. 1084.

On April 24, 2020, during a VA mental health counseling session, Plaintiff reportedly denied any "health [or] medical concerns." Tr. 1195.

On November 17, 2020, the U.S. Veterans Administration noted that Plaintiff had complained of "left temporal pain, 7/10, sharp, occurring every other day since he had [a] head injury in 2014  . . .   diffuse headache worse on top of head, tightness, typically

wakes up with it . . . [history] of similar pattern every few weeks [for] years." Tr. 1176, 1179.

Plaintiff maintains that his headache condition worsened, "beginning around Spring/Summer of 2021."[6]

On April 27, 2021, Plaintiff was examined by Susan Dantoni, M.D. ("Dantoni") for a consultative internal medicine examination related to his disability examination. Tr. 1054.  Plaintiff's chief complaint was "back pain,"[7] but he also reportedly told Dantoni that he "gets migraines five times per week." Tr. 1054.  Dantoni, though, did not opine that Plaintiff had any limitations related to headaches. Tr. 1057.

On April 28, 2021, Plaintiff was examined by Christine Ransom, Ph.D. ("Ransom") for a consultative psychiatric evaluation related to his disability application. Tr. 1059. Plaintiff reportedly told Ransom that he stopped working as a sales associate "in 2019 due to migraines." Tr. 1059.

On July 6, 2021, Plaintiff visited Jennifer Maguire, M.D. ("Maguire"), in Rochester, complaining of headaches. Tr. 1102.  Plaintiff described having "throbbing" headaches four times per week, each lasting roughly thirty minutes, that made it "hard to keep focus." Tr. 1102. Plaintiff also claimed to have "phonophobia and photophobia." Tr. 1102. Plaintiff stated that he got "good relief" from non-steroidal anti-inflammatory ("NSAID") tablets, but "fe[lt] like he would benefit from a stronger NSAID." Tr. 1103.   Maguire

---

[6]  Pl. Memo of Law, ECF No. 8-1 at p. 15.

[7]  Plaintiff reportedly told Dantoni that, "while in the army he fell off a truck and injured his back," Tr. 1054 (emphasis added), but he reportedly told another examiner that he injured his back falling off a truck while working for Lowes. See, Tr. 1084 ("hurt while working at Lowes (3 years ago), fell off supply truck.") (emphasis added).

prescribed Mobic/meloxicam, to be taken when Plaintiff was having a headache, as well as a "low-dose [of] amitriptyline" to take "for prophylactic purposes of [avoiding] both migraine and tension headaches." Tr. 1103.

On July 9, 2021, the U.S. Veterans Administration ("VA") made a notation that Plaintiff had telephoned and was complaining of "headache." Tr. 1164 ("[V]et wanted referral to a specialist for this 'service connected headache.'   He has been having it for 7 years.   He treats it with 'Tylenol' with relief.").

On August 31, 2021, Plaintiff completed a disability questionnaire in which he stated that he experienced "at least 60" headaches per month and "at least 14" headaches per week; that the headaches involved "throbbing, stabbing" pain on the "left and right sides of his head"; and were accompanied by "blurry vision," "dizziness," and "nausea." Tr. 476.   Plaintiff further indicated that he took acetaminophen twice per day, which worked "right away" and provided pain relief for "at least an hour." Tr. 476.

On March 16, 2022,[8] Plaintiff visited primary care doctor Thomas Campbell, M.D., concerned that a lump behind his left ear, that was later determined to be a lipoma, might be cancerous. Tr. 1107.   Notably, though, Plaintiff denied having any consistent headaches. Tr. 1107 ("No consistent HA").

On April 12, 2022, Christina Prokop noted in a VA medical record that Plaintiff was complaining of headaches that he claimed were caused by the lipoma behind his left ear:

---

[8] Plaintiff indicates that prior to this he had been living in Las Vegas for a year.   Plaintiff testified that he was forced to move to Las Vegas to live with a relative because he became homeless.   Although, there is also an indication that he attended law school during that same year, Tr. 1106, 1107, and there are also references to Plaintiff living in Los Angeles during this same period. Tr. 1254 (Treatment note dated August 8, 2022, stating, "Recently moved back to Rochester after being in LA for 2 years.").

"Has a knot in the back of his head for which he saw his PCP and had an ultrasound, is awaiting results.   Goes to gym 2 time per week.   Feels a knot in the back of his neck and it causes headaches." Tr. 1095.

On April 15, 2022, Plaintiff saw Eric Paul, M.D., for an annual well visit and expressed "no acute concern." Tr. 1118 ("Acute Concerns-None").   Dr. Paul listed Plaintiff's ongoing medical concerns, which did not include headaches, Tr. 1119, and upon a "review of systems" he expressly noted that Plaintiff "denies headache." Tr. 1120.

On April 21, 2022, Prokop completed a medical source statement referencing a diagnosis of "headaches," evidently related to "lipoma of neck," adding, "back of neck, frequently radiates to head." Tr. 1098-1099.   Prokop opined that Plaintiff's conditions would interfere with his ability to pay attention and concentrate at work only "occasionally," but also stated that Plaintiff would likely miss two days of work per month. *Id*.

On May 6, 2022, Joseph Pereira, D.O. examined Plaintiff for complaint of rectal bleeding, and in his "review-of-system" notes he indicated that Plaintiff complained of "light-headedness" but not headaches. Tr. 1125.

On May 12, 2022, Plaintiff had an appointment with Maryana Zakharchishin, N.P. ("Zakharchishin") for the purpose of filling out "disability paperwork." Tr. 1134.   Notably, the alleged disability was related to "low back pain," though Zakharchisin noted that Plaintiff also had a "history of headaches." Tr. 1101 ("Hx of headaches"); Tr.   1134-1136.

On July 5, 2022, Plaintiff saw Dr. Maguire for a "migraine follow up," a which time he complained not of headache, per se, but of pain behind his left ear related to a chronic lipoma, for which he was not taking medication. Tr. 1247 ("[I]s getting pain behind the left

ear[;] is constant pressure – feels like fluid behind the ear[;] not taking anything for the discomfort.").

On August 3, 2022, Plaintiff had a telehealth visit with Jasdeep Singh Bajwa, D.O. ("Bajwa"), to obtain forms to allow him to be discharged from the military. Tr. 1252 ("Reason for visit: Form Request"); Tr. 1253 ("Filled out disability form for patient for long-term discharge from military services given his uncontrolled conditions.").   Bajwa observed that Plaintiff was in no apparent distress, but reported the following concerning Plaintiff's complaint of "headaches": "Still seeking care from the VA.   They are relatively controllable if avoiding triggers.   At times so debilitating that he cannot do anything and must rest in bed.   He is seeing a specialist in the foreseeable future." Tr. 1252.

After Plaintiff's SSDI claim was denied initially and on reconsideration, on June 21, 2022, he had a hearing before an ALJ. Tr. 75-98.   Plaintiff stated that he was able to drive a car for "at least 20 minutes" before experiencing back pain. Tr. 84.   Plaintiff stated that his last employment was "at Macy's," as a "cashier," in 2019, and that he stopped working because of "back pain." Tr. 81. ("Q Why did you leave? A The back pain.   It was getting to me.   I couldn't stand up too – any longer, so.").   Plaintiff stated that he was currently unable to work in part due to headaches, stating, "The headaches, they're real severe, so I can't focus probably like an hour I could probably do heavy work, thinking. But after like an hour, the headaches can't make me stay focused, so I always take continuous breaks in between." [sic] Tr. 81.   Plaintiff further stated that he had headaches "every day," with "probably" "three headaches a day," each lasting "mostly between an hour." Tr. 84 ("I'm out of commission for that hour.   I mean, I can't do

11

anything when have the headaches.").   Plaintiff stated that he was taking only over-the-counter acetaminophen and ibuprofen for pain. Tr. 82.   The ALJ asked Plaintiff what triggered his headaches, and Plaintiff stated: "Stress, too much things doing on, the conversations.   Too much – too many people around me, it triggers the headaches. Headaches when I'm doing the coaching league, doing something, moving around a lot, I get those headaches." Tr. 84.   When asked if his headaches occurred mainly in the morning, Plaintiff denied that they did, stating that they occurred throughout the day without any pattern. Tr. 85 ("Q Is there a time of day that the headaches usually happen? Like an evening?   Maybe the afternoon?   The morning?   A. No. Morning, afternoon, evening.   Q So there's no pattern?   A Uh-uh.").

The ALJ sub subsequently denied Plaintiff's claim, after which the Appeals Council remanded the matter for further administrative proceedings and development of the record.

On January 10, 2023, approximately six months after the first hearing, Plaintiff had a further hearing before an ALJ, at which he and a VE testified.   Notably, although the ALJ asked many of the same questions as at the initial hearing, Plaintiff gave quite different answers.   For example, Plaintiff stated that he was able to drive a car only "about half a mile" before needing to stop due to back pain. Tr. 45.   Plaintiff also stated that his last employment was at "Lids" hat store, in 2019, and that he stopped working due to combination of back pain and anxiety: "It was pretty much my back, my depression, and anxiety, and stuff, my mental health – my mental health state, I couldn't just – I couldn't work anymore.   That was my last job." Tr. 48-49.   Regarding his migraine

headaches, Plaintiff indicated that he experienced "debilitating" headaches "two to three times a day," mainly in the morning, each of which prevented him from doing his usual activities for between five and twenty minutes. Tr. 54-55.

Plaintiff further testified that he was not aware of any "triggers" for the headaches, in response to which the ALJ directed his attention to the August, 2022, medical note by Dr. Bajwa, in which Plaintiff had stated that his "headaches [were] relatively controllable if [he] avoid[ed] triggers."   Plaintiff then indicated that his headaches were triggered by "moving fast" to complete tasks and by "focusing intensely" on tasks. Tr. 56; *see also, id*. ("Q So you think that's what aggravates your headaches when you're required to focus intensely on things that are tasks?   A Yeah.").

The VE testified, in pertinent part, that a hypothetical claimant could not maintain competitive employment if he either was off-task fifteen percent of the workday or missed work two times per month. Tr. 70-71.

On January 24, 2023, the ALJ issued a Decision (Tr. 17-30) finding that Plaintiff was not disabled at any time between January 29, 2019, the alleged disability onset date, and the date of his decision.   The ALJ conducted the five-step sequential evaluation and found, in pertinent part, that Plaintiff had severe impairments consisting of low back pain, obesity, migraines, left wrist tendonitis, major depressive disorder, and generalized anxiety disorder; that those impairments, either singly or combined, did not meet or medically equal a listed impairment; that Plaintiff had

> the residual functional capacity to perform light work . . . except he cannot climb ladders, ropes, or scaffolds, no workplace hazards including unprotected heights and open, moving machinery, can occasionally climb

> ramps and stairs, balance, stoop, kneel, crouch, and crawl, no lights brighter
> than standard overhead fluorescent and no more than moderate noise[.]
> He can understand, remember, and carry out simple instructions, can
> tolerate occasional simple changes.   He cannot perform work requiring a
> specific production rate such as assembly line work or work that requires
> hourly quotas[;]

that Plaintiff was unable to perform any past relevant work; but that with the aforementioned RFC, Plaintiff could perform other work, such as "collator operator," "photocopy machine operator," and "folding machine operator;" and that Plaintiff was therefore not disabled.

In making his RFC finding, the ALJ discussed the relevant evidence concerning Plaintiff's headaches. Tr. 22-29.   For example, beginning with Plaintiff's own statements to doctors, the ALJ noted that when Plaintiff was examined by Dr. Dantoni, "[h]e reported having migraines 5 times per week." Tr. 24.   Further, the ALJ stated that, "[i]n June 2020, his primary care provider noted a headache frequency of three times per month for the last 5 years, since his departure from the [military] service." Tr. 24.   The ALJ also noted, however, that in November, 2020, Plaintiff indicated that he experienced "intermittent headaches," with a "pattern occurring every few weeks," Tr. 25, and that in August, 2022, he indicated that his "headaches were relatively well controlled if he avoided triggers." Tr. 25.

The ALJ found that Plaintiff's statements about his headache symptoms were "inconsistent," stating in relevant part:

> [T]hey are inconsistent [.]   .  .  .   Throughout the relevant period , the
> claimant endorsed a migraine frequency of a few headaches monthly which
> resolved with NSAIDs.   He required emergency treatment on one occasion

14

when he had run out of medication.   There were no neurological deficits.
. . .   The claimant's migraines are considered in limiting him to standard
overhead lights and moderate noise.

Tr. 27.

As for the medical opinion evidence, the ALJ generally found it persuasive, but he
found the opinions of both Prokop and Zakharchishin "not persuasive," insofar as they
were "not fully supported by the objective medical evidence" and "not consistent with
claimant's level of care," respectively. Tr. 28.   For example, regarding Prokop's opinion
that Plaintiff would miss two days of work per month, the ALJ found it unpersuasive since
"[a] wellness exam performed by [Prokop] on April 15, 2022 showed no findings which
would support the level of pain, time off task, and frequency of absences described." Tr.
28.   Similarly, regarding Zakharchishin's opinion, the ALJ found that the "extreme
limitations [she] assessed as to . . . time off task, and absences from the workplace are
not supported by the objective medical evidence" and "are not consistent with the
claimant's level of care, with . . . little specialty evaluation . . . and pain treated with Tylenol,
naproxen, and or ibuprofen for many years." Tr. 28-29.

Plaintiff, though, maintains in this action that the ALJ's decision is "founded upon
legal error" and "not based upon substantial evidence," with regard to how it evaluated
his headache symptoms.   Plaintiff primarily contends that the ALJ ignored evidence that
his headaches worsened "in the Spring/Summer of 2021," stating: "The level of Plaintiff's
migraine headaches frequency and severity beginning around June 2021 indicates that
they would cause Plaintiff to exceed minimal standards of attendance, pace, and

15

productivity in the workplace according to the standard set forth by the VE."[9]   Plaintiff argues that, since he testified that his headaches were triggered by things like "stress, too many things going on, too many people around him, moving around a lot, and [being] required to focus intensely on tasks," "if [he] were to perform work in the competitive economy, his headaches would be triggered."[10]

Plaintiff further argues that the RFC finding is erroneous since "[m]erely including limitations concerning light and noise is insufficient [to] account for [his] migraines as the ALJ failed to consider whether the severity and frequency of migraine headaches would have caused Plaintiff to exceed minimal standards of attendance, pace, and productivity."[11]

Finally, Plaintiff contends that the ALJ's inclusion of limitations on exposure to light and sound in the RFC finding is "conclusory and unsupported by competent medical evidence," since, although Plaintiff admittedly "did report sonophobia and photophobia associated with migraine headaches," "the ALJ failed to explain how experiencing sonophobia and photophobia equates to a finding that [he] is able to tolerate no lights brighter than 'standard fluorescent' lights and a 'moderate' noise level."[12]   According to Plaintiff, the ALJ "should have consulted with a medical expert instead of rendering an RFC finding based upon his 'own surmise.'"[13]

Defendant disagrees and insists that the ALJ's decision is free from error and

---

[9]  Pl. Memo of Law, ECF No. 8-1 at p. 16.
[10]  Pl. Memo of Law, ECF No. 8-1 at p. 17.
[11]  Pl. Memo of Law, ECF No. 8-1 at p. 17.
[12]  Pl. Memo of Law, ECF No. 8-1 at p. 17.
[13]  Pl. Memo of Law, ECF No. 8-1 at p. 17.

supported by substantial evidence, as discussed further below.

The Court has considered the parties' submissions and the entire administrative record.

DISCUSSION

Plaintiff maintains that if the ALJ had properly evaluated the evidence he would have found that his headache symptoms worsened in 2021 to the point that he would be off task at work more than fifteen percent of the time and/or would miss two days of work per month, which would require a finding of "disabled."[14]  Plaintiff essentially contends that the ALJ should have credited his statements concerning the frequency and severity of his headache symptoms, which "would cause [him] to exceed minimal standards of attendance, pace, and productivity in the workplace according to the [testimony of] the VE."[15]  Plaintiff further contends that the ALJ's decision "omits a portion" of the evidence, since it does not discuss his statement on August 3, 2022, "that his headaches could become 'so debilitating that he cannot do anything and must rest in bed.'"[16]  Plaintiff maintains that because of this alleged failure by the ALJ to consider the evidence, the ALJ finding "insufficiently" accounts for his headaches by "merely including limitations concerning light and noise."[17]  Plaintiff further contends that the RFC finding's inclusion of limitations on light and noise to account for his headaches is "conclusory and

---

[14] See, e.g., Pl. Memo of Law, ECF No. 8-1 at p. 18 ("The ALJ failed to consider the impact Plaintiff's migraine headaches had on his ability to maintain minimal standards of attendance, pace, and productivity in the workplace during the relevant period, especially beginning in the spring/summer of 2021.").

[15] Pl. Memo of Law, ECF No. 8-1 at p. 16.

[16] Pl. Memo of Law, ECF No. 8-1 at p. 17.

[17] Pl. Memo of Law, ECF No. 8-1 at p. 17.

unsupported by competent medical opinion."[18]

Defendant counters that the ALJ properly considered all the evidence concerning Plaintiff's headaches, and that Plaintiff "lacks evidence to show that any reasonable factfinder [would be] compelled to assess greater functional limitations than those accounted for in the [RFC] finding."[19]   According to Defendant, the ALJ "thoroughly" considered the evidence and found "that Plaintiff's migraines were relieved with medications and trigger-avoidance and required minimal and conservative treatment."[20] Defendant argues that "Plaintiff points to no evidence in support of his argument except for his own subjective allegations and testimony, and the fact that he was prescribed prophylactic headache medication in June 2021."[21]   Defendant further states that,

> Plaintiff points to an approximately four-month period of time, from April 2021 to July 2021, during which treatment records show complaints of frequent migraines, along with his testimony of daily migraines.   However, Plaintiff fails to acknowledge the entire longitudinal record, which shows minimal complaints of migraines when considered as a whole.   Indeed, treatment records show Plaintiff denied or did not report headaches and migraines at appointments in 2019, 2020, 2021, and 2022.   Similarly, in May 2022, Plaintiff sought completion of disability paperwork from NP Zakharchishin, reporting he was 'looking to get temporary disability due to back pain,' and he did not report [that] headaches contributed to his inability to work.   . . .   Furthermore, while Plaintiff was prescribed amitriptyline as a prophylactic in June 2020, subsequent records do not show that he continued using this medication.   Rather, Plaintiff testified that he was only taking ibuprofen to control headaches.   . . .   Additionally, although Plaintiff reported he had been referred to see a neurologist in July 2021, the record

---

[18] Pl. Memo of Law, ECF No. 8-1 at p. 17; *see also, id*. at p. 18 ("The ALJ's findings that Plaintiff is limited to no lights brighter than standard overhead fluorescent lights and no more than moderate noise were unsupported by substantial evidence.").
[19] Def. Memo of Law, ECF No. 9-1 at pp. 1.
[20] Def. Memo of Law, ECF No. 9-1 at pp. 4-5.
[21] Def. Memo of Law, ECF No. 9-1 at p. 5.

does not suggest Plaintiff followed through with this referral[,] . . . which further supports the AJS's finding that the condition was adequately managed without need for specialized treatment. . . . As the ALJ also observed, the record showed normal neurological examinations. . . . On this record, Plaintiff has not met his burden of showing that 'no reasonable factfinder' cold have concluded, as the ALJ did, that Plaintiff's migraines were generally well managed with conservative treatment and therefore, [were] not disabling or warranting further limitations than reflected in the RFC.

Def. Memo of Law, ECF No. 9-1 at pp. 6-8 (citations omitted); *see also, id*. at p. 6, n. 3 ("The record also shows that Plaintiff reported headaches caused by a lipoma, unrelated to his migraines.") (citation omitted).

The Court agrees with Defendant. First, the Court finds that Plaintiff has not shown that the ALJ failed to consider evidence concerning his headaches. Rather, the ALJ indicated that he considered the entire record, *see, e.g.*, Tr. 18, and it appears that he did so. Plaintiff has not shown otherwise. Instead, Plaintiff merely contends that the ALJ "omitted" a particular piece of evidence by failing to expressly discuss it, but such argument is clearly contrary to the law, as noted earlier.[22]

Neither does the ALJ's decision not to credit Plaintiff's statements amount to a failure to consider the evidence. Rather, the ALJ found that Plaintiff's statements about his headaches were "inconsistent," and that finding is amply supported by the record as summarized above. That is, Plaintiff was inconsistent in complaining about headaches

---

[22] Nor does the Court find that the ALJ's failure to specifically reference Plaintiff's statement in Bajwa's office note – that "[a]t times [his headaches' become so debilitating that he cannot do anything and must rest in bed" – amounts to improper "cherry picking" of evidence or otherwise requires remand. The ALJ did deny Plaintiff's claim based on a lack of subjective statements from Plaintiff concerning the alleged severity of his headaches but, rather, he did so based on the fact that such statements were not consistent with the rest of the evidence.

at all, and, when he did complain about them, was inconsistent in describing their nature, frequency, and causes.   (Although, he was consistent in stating that the headaches were relieved with just NSAIDS)   Indeed, the ALJ's finding that such statements were "inconsistent," which they plainly were, suggests that he looked carefully at the record.

The Court similarly finds no merit to Plaintiff's contention that the RFC finding failed to adequately account for his headaches by including limits on exposure to light and noise. As a preliminary matter, Plaintiff's argument that the ALJ failed to properly account for all his headache "triggers" in the RFC finding is somewhat disingenuous, since Plaintiff was very inconsistent in describing such triggers, and at one point, even denied that there were any such triggers. *See*, Tr. 55 ("Q Have you identified a trigger for your headaches? A I haven't.   Maybe it's with the diabetes.   I have a family issue of diabetes and sugar and stuff.[23] I have no idea.").   Moreover, contrary to what Plaintiff maintains, the ALJ's decision to include limitations on exposure to light and loud noise in the RFC finding was neither "conclusory" nor the result of "mere surmise," since Plaintiff claimed to have "phonophobia and photophobia" related to his headaches. Tr. 1102.   Additionally, while Plaintiff faults the reasoning by which the ALJ limited him to exposure to only "standard overhead lights and moderate noise," he has not shown that a reasonable factfinder would be compelled to find that different or additional limitations were required in the RFC finding to account for his phonophobia and photophobia.

---

[23] Plaintiff's suggestion that his headaches were caused by diabetes is further evidence of the inconsistent nature of his testimony, since the record indicates that his father had diabetes, but that he himself had "no history of" diabetes. Tr. 589, 767, 815, 843.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 8) for judgment on the pleadings is denied, Defendant's cross-motion (ECF No. 9) for the same relief is granted, and this action is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
        March 20, 2024

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

21